We'll hear argument next in Case 24-1068, Monsanto Co. v. Durnell. Mr. Clement? Mr. Chief Justice, and may it please the Court, Respondent's label-based failure-to-warn claim is preempted twice over. First, it is preempted by the express terms of FIFRA's Express Preemption Clause, which forecloses state labeling claims that are in addition to or different from those imposed under FIFRA. Here, a Missouri jury imposed a cancer warning requirement that the EPA does not require. That additional requirement is preempted. Now, Respondent concedes, as he must, that the state tort law is a labeling requirement for purposes of the preemption clause. Bates held as much. Nonetheless, he insists that unless Congress expressly directs the agency to bind the judiciary, then the requirements that are imposed on a particular pesticide in the registration process and backed by criminal penalties are not federal requirements. That defies common sense, the statutory text, and this Court's precedents. In particular, this Court's 8-to-1 decision in Regal, where this Court held that similar agency-imposed requirements on a particular device are federal requirements for preemption purposes. The same result follows from principles of impossibility preemption. The EPA regulation and the government's brief here makes crystal clear that a registrant cannot change the safety warnings on a pesticide label without approval of the agency. Thus, the Missouri law here requires something that not only is not required by federal law, but that federal law doesn't even allow. Either way you come to it, either via express preemption or impossibility preemption, the result here is clear. Congress plainly wanted uniformity when it came to the safety warnings on a pesticide's label. Ignoring Congress's clear direction here would open the door for crippling liability and undermine the interests of farmers who depend on federally registered pesticides for their livelihood. I welcome the Court's questions. Mr. Clement, just for clarification, you seem to focus more on the label requirement in your brief and your argument, and Respondent seems to focus more on the underlying statute, FFRA. I could be wrong on that. Would you comment on that? Well, I guess, Justice Thomas, I think about it as a level of generality debate, and I don't want to put words in my friend's mouth, but I think he says, well, you know, what's the conflict here? State law looks to whether it's misbranded, federal law looks to whether it's misbranded. And I think that actually mistakes the inquiry both on the state level and on the federal level. I mean, state law, at least the applicable state law here, really doesn't address labeling of pesticides. It's a negligence duty of good care or due care. The way that you get to actual pesticide labeling is a jury applies that general tort law to a specific device and then decides a particular warning is necessary. In the same way, on the federal level, you don't look just to misbranding in the abstract, but there's a process to take that down to the concrete, and that process at the federal level is the registration process where the agency can't even register the pesticide unless it makes a determination that the label complies with the statute. Well, I think my point is, first of all, this is a herbicide, not a pesticide, but I think my point is that what is the operative federal statute or regulation that has a preemptive effect? Is it the regulation, is it the labeling requirement, or is it FFRA? So it's all of the above, but to give you a textual answer, it's the federal requirements under FFRA. And that word under, I mean, I know the other side sort of mocks us for focusing on a preposition, but the word under is important here, because if the statute just said the preemption clause in particular, 136db, if that provision said by FFRA, there might be something to my friend's arguments. But the language of FFRA's preemption provision, just like the language of the preemption provision from the medical device amendments that were at issue in the Regal case, both of those uses the word under, and I think that word textually captures the various requirements that are imposed at a device-specific level or a herbicide-specific level in the context of the registration process here. Mr. Clement, you don't dispute that a product that has been registered can become misbranded, right? Sure, and the clearest way for a registered pesticide or herbicide to become misbranded is to omit something from the label that is required by EPA in the registration process. So you just don't follow the process, but are you saying that if new information comes out in the 15-year interregnum between registration and reregistration that casts doubt on the efficacy or the safety of this product, you could have a product that is misbranded even though it has been registered and initially labeled properly, correct? So I would take issue with that with respect to safety. Efficacy, as I think you know, is different, and that's why I think the Bates case is quite distinguishable because the agency actually doesn't have to evaluate efficacy. But as to safety, I think the process if there's some new information that comes out. First of all, the registrant has a statutory requirement backed by criminal penalties to bring adverse information to the agency. So I understand how it is brought to the agency's attention under the statute. What I'm asking is could we have a world in which a product that has been registered, the label is consistent with what the agency has said is appropriate at the time of registration, but let's say a new research study comes out at some point between when the EPA is statutorily required to look at it again that casts doubt on the safety of this product. So my understanding is that under Bates and the way the statute reads in saying that registration is not a defense to the offense of misbranding, that you could have a product that is registered that becomes misbranded. Am I right about that? So I disagree with that. The government may have a different view. I think the way that you deal with that and the way the agency deals with that is either through some amended registration or some cancellation process, which could be subject to judicial review. But what you don't just do is to say, well, there's been label drift here. No, no, no. I'm just asking you whether misbranding and registration are two separate things. They are two separate things, but I guess what I'm resisting is the idea that because of some subsequent development, a registrant who uses the EPA-approved label could somehow have just kind of drifted into a misbranding violation. I don't think that's the case. Just to put a pin on that, I do want to just make sure I understand where you're coming from. So you're saying a properly registered product can never be misbranded? I'd say no. I wouldn't say that. What I would say is a registered product that is marketed as labeled and approved by the agency is not misbranded. Can never be misbranded. Well, I mean, right, but of course the EPA- No, I just want to make sure I understand. I mean, that is my position, but I do want to say it's not that registration somehow makes misbranding impossible because you can deviate from the agency-approved label. That wasn't my question. Could the agency come after you for misbranding if you didn't comply with your statutory obligation to give the updated information to the EPA? Absolutely. But it wouldn't be a misbranding action. It would be a criminal action or a civil action for violating your specific requirement under 136B, I think it is, to keep the agency updated. And I think that's important, of course, because that would be the federal government essentially making sure that its registrants are continuing with their ongoing obligations, and that would sort of be more consistent with the thrust of Buckman, where if you have a situation where your concern is that somehow the registrant hasn't done something they're supposed to do vis-a-vis the agency, you give the agency the ability to take care of that. You don't say somehow you're going to put that all in front of a jury, and the jury is going to determine not just how this should be branded, but also whether or not the registrant kept the agency sufficiently up-to-date. What if the agency, EPA, says we've got this new information and we're reviewing it? We're reviewing it. As soon as we get to a point where we feel comfortable recommending something, we will. In that situation, the state can't make a determination that, well, we have this new information, so that it's perhaps the EPA's determination of the label shouldn't be given such determinative effect. In other words, it's not necessarily the case that they're doing something inconsistent with what EPA would do. It's simply a fact that they're responsive to the new information more quickly than the federal government is. Well, if they're more responsive than the federal government and the way they sort of manifest their responsiveness is to mandate an additional or different labeling requirement, I think that walks them in directly to the plain text of the express preemption in FFRA. And I don't think the situation is any different for purposes of medical device amendments and this Court's decision in Regal. You could have the same situation where there's additional information that comes to light, and there are processes for getting all of that in front of the agency. If the agency takes its time, and it might want to take its time, because it's charged with the responsibility of looking not just at sort of how the new information affects hazards and the like, but also how it affects the alternative pesticides, how it affects the overall dynamic, and the rest, I think you want to give the agency the time to do that. And I think in that respect, it's important that when the real way to deal with this, I think, would be if you think the agency's not being responsive enough, is to initiate a cancellation proceeding. Well, I mean, how is that consistent with 136AF2? It seems to me when you're saying, well, the state can't do anything about it, it's because you're relying on the registration. Well, no, I don't think so. I think you're relying on the entire registration process. But I do think with respect to F2 in particular, I mean, first of all, I think the first problem with relying on F2 to be a game changer here is that F2 actually, as written, really, as I read it, is only limited to EPA enforcement actions. Because what it talks about is that the registration is in no event a defense for the commission of any offense under the subchapter. And that offense under the subchapter, I think, does talk about an EPA enforcement action. And I don't think even a nonpreempted state tort suit is an offense under the subchapter. So with all respect, I think F2 is a bit of a red herring here. I do think, though, as long as we're looking at F, F1 is actually the more relevant provision here, because that's the statutory provision that tells a registrant that they can't change the label without the agency's approval. Before we leave F2, if, supposing that EPA can bring a claim against you for misbranding and seek criminal and civil penalties despite a properly registered item, how would it be inconsistent with FIFRA to allow state tort suits to do the same thing? So it would still be inconsistent with FIFRA and the plain text of the statute to allow a state tort suit to do the same thing. And if you imagine a situation — Why is the question. So why is because there would be a grave risk, and I think it is manifested in this case, that the state requirement would be different from or in addition to — Assuming it's the same. So even if you assume that it's the same, I think that you have a problem here, which is the idea would be that the state requirement would be to add something to the label. And under the plain text of F1 and the relevant regulations, 40 CFR 156.70 sub C and 152.44 sub A, those provisions say that the registry cannot change the label with respect to — So that's really what it boils down to then for you. It's not that you can, in fact, have misbranded but registered items, and EPA can seek remedies against you. You're just saying nobody else can do the same, even if it's the parallel proceeding, no additional requirements, because you have to go through processes to amend the label. So this really boils down to the impossibility argument then, doesn't it? Well, I mean, I think they're closely related. I think they're slightly different. I mean, part of it is like you've asked me to assume something, which is that the EPA would go after us for misbranding. I don't think the EPA would ever go after a registrant for a misbranding that was based on the failure to include something on the label that EPA itself says that they can't unilaterally add to the label. So maybe EPA would go after a registrant in the context of some efficacy claim or something like that, where EPA's position is the registrant is perfectly free to change the label, but where the arguments sort of come together is because EPA quite clearly takes the position that as to the safety warnings and the hazard warnings, those are things that the registrant can't change on their own. With respect to that, if it all does boil down to the impossibility idea that it's hard to add to these labels without EPA's permission, what do we do about the fact that, at least as Rhys before us suggests, that registrants have added cancer warnings to their labels without EPA permission or objection? So I think those are essentially just a couple of episodic things that the EPA itself addresses in their brief and says were essentially implementation mistakes. I mean, there may be slight quibbles about kind of each one of them and how they came to pass. One of them I don't think was actually construed by the agency as a hazard warning, so maybe they thought that something, you know, was more of a controversy warning about Prop 65 or something like that. And, of course, in fairness, this is not a situation where the EPA has always had exactly the same interpretation across administrations. I've spotted that. Yeah, no, exactly. But I do think, you know, my short answer to your question is to the extent that was ever allowed, it's actually flatly inconsistent with the EPA's regulations that haven't changed across administrations, and I think those are worth looking at carefully because they are unambiguous. I mean, CFR 144A and 156.70C, and that one is just absolutely unambiguous. You as a registrant cannot change your safety warning, full stop. If EPA came after someone for the label after telling you what must be on the label and saying you can't change the label legally, I mean, that would seem like a due process problem or something where the agency says you have to do this and then sues you for doing what they told you to do. I completely agree, which is why I resist the idea that you could have a pure misbranding claim brought by the agency against a registrant for marketing the product with the EPA-approved label that EPA tells you you can't change. Even in a new evidence circumstance, I feel like I understand your argument with respect to the T1 registration, EPA's looking at the label, it makes a determination on existing evidence, but there's a 15-year window between when that product has to be re-registered again, and lots of things can happen in science in terms of developments about the product. So if the product can become misbranded because of new information, I guess I'm just wondering why you think that you couldn't have a situation where it would be perfectly rational for either the EPA or the states to bring to the attention of that manufacturer this new information and process a claim related to it. All of that can happen, but it doesn't become misbranding. What happens is that information, first, the registrant has a statutory obligation backed by criminal penalties to bring it to the attention of the agency. And then second, anybody can initiate a cancellation provision and get judicial review under 136N, and the government has taken the position here that that's subject to judicial review. Thank you, Counsel. Justice Thomas, Justice Alito, Justice O'Mara. I just want to pin down the area of dispute, because I, too, believe that misbranding and registration were not inconsistent. A claim by Fairfax that someone has mid-branded can come even when registered. You're taking the position, I think, that misbranding would be limited to things that are not covered by the registration, meaning you change the label, you add something to it, you change it in some way. Correct?  You are, I think, answering Justice Jackson and Justice Kavanaugh, I think, by saying, if it's a failure to warn of something you should be warning, that would not be a misbranding claim. It would be a violation of a FRFRA obligation to disclose that information and ask for a change.  And I think that way of looking at the world makes the whole regime, A, mirror the medical device amendments regime, but also makes it work a lot more sensibly, because otherwise what you're basically telling a registrant is they can go through this whole process, which exhaustively considers not just the product and its active ingredient, but all in conjunction with the label to make sure that it's safe and effective as used and has, like, a danger label if it needs it or a caution label if it needs it. They go through all that process, and then the next day they market it as labeled and they could have it all be subject to a misbranding claim. I think the problem is 136AF2, because it also says, A valid registration, however, is prima facie evidence that the pesticides with labeling and packaging comply with the registration provisions of FRFRA, but it's prima facie. It's not presumptive. And so it seems to me, if it's prima facie, it could be rebutted, that FRFRA could come in and say, you misbranded because you failed to tell us about this risk. So misbranding isn't the only offense under the statute, and there's a specific criminal penalty for failing to comply with your obligations as a registrant under that. So if you have a hypothetical registrant who has some terrible information that comes out that they're obligated under the statute to give to the agency and they withhold it, they are certainly subject to criminal penalties, but it's not a misbranding claim. And I think it's a mistake to think all the different ways that a registrant can violate FRFRA all come down to misbranding. I mean, misbranding is just one species. And, of course, the most obvious violation, and this is why there isn't this inconsistency between registration and misbranding, the most obvious way to commit a misbranding violation is to omit something from the label that you were told you had to put on it in the registration process. That's a misbranding claim. And, of course, it would only be prima facie evidence because you blew it. You misbranded. We have two lines of impossibility defense. Pliva and Wyatt are also there. Doesn't the history we're showed about the manufacturer who added the California 50 proposition information without FDA approval, doesn't that defeat your impossibility argument? It doesn't defeat your other arguments, but why doesn't it? Because the agency has, you've said, by error, whether it's error or not, they've permitted this to be done. So I don't think my answer to that would be I don't think Pliva and Bartlett come out differently. I think that would have actually made those generic pharmaceuticals mislabeled, if I understand that regime, which is why it didn't happen. But I think you look to the law. You don't look to whether somebody essentially did something that was ultra-virus. And if you look to the law here, this is, and the government flat out says this in their brief, this is really analogous to the fact that the FDA is not allowed to change the label on a generic pharmaceutical. It's the generic labeling regime, not the branded regime. Thank you. Justice Kagan. And Mr. Clement, not to say you're wrong about your view of the scope of the misbranding actions, but if you were wrong, how would it matter? Could you still win if misbranding actions were more expansive than what you're arguing? I mean, I suppose I could, and I suppose you could kind of just go with impossibility preemption and make this, like, very simple, because I just think you look at those regulations and it makes it clear we can't change the label. The reason I'm sort of, you know, fighting on this, and the reason I think I'm not wrong, is because I think that there, as I said, you know, when it comes to misbranding, that's very specific. The easiest way to commit a misbranding offense is to omit something that you're required in the registration process to put on the label if you omit something. And if, of course, the state thinks you need to add something that EPA is not requiring you to put on the label, I mean, that just walks squarely into the text of the express preemption clause. And part of the reason I'm kind of, like, resistant to put all the weight on impossibility preemption is because, you know, in some respects the express preemption clause is even broader because it doesn't require an actual conflict. You know, if the state imposes a labeling requirement that's different from or in addition to, that's still preempted by the plain text of the statute without really regard to whether it's misbranded. And it seems to me that if EPA, once you go through the registration process, they tell you what's required to be on your label. And there's really no way to look at this case and not come to the conclusion that a Missouri jury has told us that a cancer warning that EPA hasn't required us to put on the label is required to put on that label. And that just seems like a requirement in addition to what's required by the EPA. And if you can get there without saying the word misbranding or thinking that, you know, I have to be right about that, I'm totally fine with that. I just happen to think that from the perspective of my client, I mean, I guess what I would say is this. We go through that entire registration process. The way I would understand that is the agency is giving us a green light that we can then go forward and market a pesticide or a herbicide as labeled and not have to worry about a misbranding offense. We respond to all the other statutory requirements. And, again, that's exactly parallel to what happens in the medical devices amendments case. Once you get that device and it's approved with labeling, I mean, you can't deviate from that labeling. And if there's additional science that comes along, you've got to get the agency apprised of that. But you can't be held liable in state court for marketing a medical device that's labeled exactly like the FDA told you to label it. And I think the same thing should apply under this statute. Justice Gorsuch? Justice Kavanaugh? Just on that, there are ways, I think you're saying, that EPA can change requirements going forward. But if it tries to say you were misbranding when you did what they told you to do, that's a retroactivity problem of sorts in the sense that they're penalizing you retroactively for something they're saying is now required that they didn't say was required before. In fact, was prohibited before. Yes, and I actually think the retroactivity frame is a helpful one because if you look at the statutory scheme, the real way you sort of change warnings or take a pesticide off the market is through the cancellation proceedings. And when the agency actually goes through the cancellation proceedings, there are requirements. They're supposed to allow the manufacturer, except in extraordinary cases, to continue to sell the existing stock. They're supposed to make a specific analysis that takes into account the reliance interest of farmers and other users. And all of that kind of makes sense, that if you're going to sort of prospectively take something off the market, you go through an orderly process. And one of the anomalies of allowing a state tort remedy to be essentially a requirement is it does have this kind of retroactive effect to it. And I think that's what makes it particularly problematic here. And I think you just covered this in part, but Justice Jackson's good point about new science, you're saying the way you account for new science is on a process that changes the requirements going forward, not on a process that retroactively tells you that what you did yesterday as ordered by EPA is somehow illegal. Absolutely. And it's an agency process that takes into account all of the various factors, costs, and benefits. And, of course, the agency has incredible resources at its command, including peer-reviewed panels, cancer review, and the like. And this case provides a perfect example of that. It's not like when this IARC study came out and said that glyphosate, like hot beverages, is a cancer risk. It's not like the agency said, we don't want to hear about it. They exhaustively studied it, and they actually did peer review that IARC doesn't do. They looked at more sources than IARC did, and then they came to a conclusion that's shared by regulators around the globe that glyphosate doesn't have a cancer risk. It's not carcinogenic. Thank you. Mrs. Barrett? Are design defect claims preempted? They're only preempted if they are disguised failure-to-warn claims. But that is an important difference from this context and the medical device amendments context, which is although they're worded similarly, the preemption clause in the medical device amendment sweeps in design defect claims, and here it's really just the labeling. But the only reason I do hesitate is because it's obviously tempting in a world where you can bring design defect claims but not failure-to-warn claims that you try to make a design defect. Well, the design problem here is the way you designed your label or that you failed to warn. So with that caveat, design defect claims are not preempted. Okay. And then you put most of your weight on express preemption, but obviously you do make the impossibility argument as well. How do you think about implied preemption when there is an express preemption clause present? It seems odd to move on to implied preemption. Wouldn't it all be governed just by the express preemption clause? Well, this Court has been very clear, and this is critical, that you don't sort of say, well, there's an express preemption clause, and so that's the only preemption we're going to do here. We're not going to do any kind of implied preemption analysis or impossibility analysis. You've squarely rejected that, and I think you should do it here too. I don't think there's a huge difference between the two here. I think if you sort of think about this, like, Regal was an express preemption case and just an express preemption case. But, of course, when Justice Scalia decided Regal, he didn't have the benefit of Pliva and Bartlett, which come later. And so if he did, you know, he might have said in Regal, well, this is both an express preemption case and an impossibility case. So I think both roads sort of lead there. At the end of the day, though, you know, I kind of like text, and I do think we get there on the express preemption provision, and I do think that, you know, in some hypothetical case, maybe not under this particular reg or this particular provision, but it's going to matter that the words in addition to are there, because that is, at least in theory, it doesn't actually require a conflict at all for a state requirement to be preempted. As long as it's an additional requirement, that's textually enough for it to be preempted. Well, yeah, I mean, it seems to me that your impossibility argument is kind of wrapped up into the express preemption argument because the whole reason it's impossible is that you are required to do that, you can't change it, and the state is prohibited from requiring anything in addition to or less than. Yeah, I guess here's the difference, though. Like, even if in theory we could change the label, I mean, we're still not required to in the registration process, and I still think the way I understand this is like, look, there's a broad general standard of misbranding. The EPA looked at that and made it concrete in terms of this particular herbicide, by saying, here's what you need on your label. A Missouri jury did the same process, took a broad standard, made it concrete to the same herbicide, and said, you need a cancer warning. And so under Missouri law, a cancer warning is required. Under federal law, a cancer warning is not required. That is a requirement that is in addition to the federal requirement, and that would be true even if we could change the label. So here they end up kind of being coextensive, but I can imagine a world where they're not. In some respects, if you're concerned about the one or two outlying examples where somebody was allowed to do a warning, I mean, the express preemption clause may be a little bit more impervious to that objection. But again, as I say, we're happy to win either way, but it's hard not to like the text. Thanks. Justice Tapsen? So I guess I'm not sure that retroactivity in the questions that you explored with Justice Kavanaugh necessarily captures all that's going on here. And I worry a little bit about the way in which you are describing this, and its seeming inconsistency with what we said in Bates. So I think that one way to understand this scheme, the statute scheme, is that there's a registration requirement and there's a no misbranding requirement. And every 15 years, EPA makes a registration decision that sets the requirements for a pesticide label based on the information that EPA has considered at that time. But in the years between registrations, the company still has to comply with the no misbranding requirement. And I guess I'm trying to understand why it couldn't be that both the EPA and state tort law can enforce the misbranding requirement in the interregnum. So, I mean, I think in Bates we said that FIFRA contemplates that pesticide labels will evolve over time. And we said, quote, tort suits can serve as a catalyst in this process. And you can see how that happens, right? When new information comes in, in that 15 years, the threat of tort liability is one thing that spurs the manufacturer to go to the EPA and make sure that they're giving them the information. But it also enforces the no misbranding requirement. So why isn't the kind of concept of the way the scheme works, as we laid it out in Bates, how we should be thinking about it? It's prospective, not retrospective in that sense. So let me try to use Bates as an example in answering your question. So the one thing I think Bates was clearest about is kind of the clearest example, and it was that Bates contemplated of a conflict that would trigger the express preemption provision, is federal law says for this particular pesticide all you need is a caution label. And state law comes in and says, no, for that pesticide you need a danger label. Bates says that's a clear, clear conflict. Well, how does EPA decide that a particular pesticide needs just a caution label and not the more serious danger level? They do that in the registration process by examining the toxicity of the substance. And then they say, all right, this is sufficiently non-toxic that it just requires a caution label. Now, let's say five years goes on and somebody with some new science goes in before a state court jury and says actually EPA got it wrong, this thing is more toxic than they thought, and so under Missouri law you need a danger label. I think that would still be clearly, clearly preempted by Bates, and the fact that you could tell the jury you need the danger label in order for the product to be not misbranded would not change anything. Well, I understand, but isn't there a world in which that is a different circumstance because the EPA has not yet considered that information? So you're not actually conflicting with, you're not doing anything different or in addition to the determination that the EPA had made based on the information that was before it. I guess I just see that, I mean, it's nuanced for sure. I mean, the way you're saying it is pretty straightforward, but you're reading the express preemption statute as though it says such states shall not impose or continue in effect any requirements for labeling or packaging, period. This says in addition to or different, which suggests that there could be a parallel state enforcement proceeding happening. I guess I would answer by saying only a completely parallel regime. So if they want to say that, you know, if my client omits something that EPA has said must be on the label and somebody gets hurt because that warning is not on the label, then you can have a tort claim that's a failure to warn claim that basically is a negligence per se claim at that level of generality that says you're liable because you didn't follow the federal requirement and we are going to give you a state remedy. That's why it is in addition to or different from. We're not striking those words from the statute. And the one thing I would say is if you read Bates carefully, at the end of the opinion on this point about tort suits can get information, there's a block quote from a court of appeals opinion. And if you actually read it carefully, what the court says by quoting that is these tort suits could generate information and then people could go and ask EPA to allow the registrant to change the label. So even in Bates, there's a recognition that there is not this unilateral ability to change the label, at least with respect to safety and warnings. And I would say this is where my answer that you can still have design defect claims is important because that could be part of the process where additional information is generated and ultimately brought to the attention of the agency. This is a narrow but critically important preemption clause. It focuses on label-based failure to warn claims, and that's exactly what this is and should be preempted. Thank you. Thank you, Counsel. Ms. Harris? Mr. Chief Justice, and may it please the Court, many paths lead to preemption here. The simplest is that state and federal law impose different and indeed conflicting labeling requirements for roundup. Missouri forces petitioner to add cancer warnings or face tort liability, but federal law requires petitioner to stick with the label EPA approved in registering the product unless EPA approves a change. EPA registers pesticides only if EPA approves their labels as adequate to protect health. Federal law then requires manufacturers to keep using that label. Manufacturers must apply to amend registration to change the label. Indeed, regulations provide specific statements pertaining to the hazards of the product must be approved by the agency. That's 40 CFR 156.70. Missouri thus requires adding cancer warnings, but federal law requires EPA to approve new warnings and tasks EPA with deciding what label changes would mitigate any health risks. State law must give way. I welcome the Court's questions. Ms. Harris, I'll ask you the same question as I asked Mr. Clement. It seems as though you are focusing on different things from the respondent. We disagree. It's true we're focusing on different things. I would say we are focusing on the text and both the text of the statute and the regulations specific to how the misbranding mandate is implemented. So the text from which we are getting the do not change the label requirement, which I agree with some of the questions is central to the case, starts off with 136AF1, a FIFRA, which says if you want to change your label, go amend it. You have to get EPA's approval. EPA has to confirm it's not misbranded. And then for other federal requirements and basis framing, I would turn you to the regulations, which are not specific just to registration. They talk about how do you change your label. And so 156.70 is the clearest. It says for hazards like cancer, you have to ask for EPA's approval. And then there's a whole welter of other ones that reinforce that. And that makes sense because EPA deals with misbranding both to prevent misbranding in what it actually has before it and to protect against people who might be estate requirements that might be adding things that are misbranded by saying, no, it's all channeled to EPA. EPA has to review changes to make sure they don't confuse people. You really have to stick with your label to safely use the product. So do you agree with everything that Mr. Clement said about how this regulatory scheme operates? And even putting aside the preemption question, is everything he said your understanding of how the agency works? I agree with him. I would just add two refinements. One, he is correct that EPA doesn't go after people for, in a hypothetical world, if things change, would you have been in trouble for not changing your label even though EPA doesn't allow you? That's right, we don't bring that kind of enforcement action. But two, not only was Mr. Clement correct in talking about cancellation proceedings, if new evidence does come to EPA's attention, and again, we don't think this is a new information case because of the time periods involved, even if it were, what EPA normally does, let's say it came to EPA's attention, we think this product might cause cancer, the requirements for dealing with that under federal law are completely different from a state just saying slap a cancer warning on the product. What EPA does, and this is at 136 AD1 of the statute, and then a whole bunch of regulations at 152.170 of the regulations, EPA first says, what's the exposure risk for cancer? Then EPA next asks, are there different forms of labeling that you could use for protective gear that would mitigate the exposure? And then if that doesn't work, EPA says, are there different things we can do to the label to restrict the use of particular crops, or say that only professional applicators can use the product? All of that, again, very different from the way that state law is processing it. And at the end of all of that, if EPA thinks that there needs to be a change in the label because it wasn't initially adequate to protect against that exposure risk, whether it's cancer, whether it's something else, but it can be solved for with these restrictions, what EPA does is not go after the manufacturer and say, you're in big trouble now. EPA has a default 120-day grace period to change the label. Now, if there's an emergency, EPA can shorten that significantly, the suspension powers. But EPA, and this is at 152.167 of the regulations, has the flexibility to say when your label changes. So in all of the particulars, not only is this a situation where EPA is controlling how to respond to a risk or new information that might change the calculus about what happens, EPA is doing so in a completely different way than just saying slap on a cancer warning and assume that that will sort of solve for the issue, because EPA is looking holistically, not only at someone who might read the label and be exposed, but also at other people in the process and endangered species. And throughout that long process, in response to information that suggests there is a risk that's not on the label, the states cannot do anything? The states can do things that add additional penalties, as Mr. Clement said, but what they can't do is try to sort of second guess or undermine this process. And I think that makes a lot of sense. Again, EPA is getting in new information. EPA is the one with suspension power. If you had 50 different states that are just like jumping the gun, Iowa says maybe this causes cancer, California says absolutely causes cancer, some other state says this doesn't cause cancer at all, so put that on your label too, it completely undermines the uniformity of the labeling scheme. Well, it does undermine the uniformity. I appreciate that. On the other hand, if it turns out that they were right, it might have been good if they had an opportunity to do something to call this danger to the attention of the people while the federal government was going through its process. But what they have the power to do is to bring suits to, you can petition for cancellation or find many other mechanisms of saying EPA currently has it wrong, spur EPA to action. What FFRA does not allow is throwing preemption out the window, throwing the express preemption clause out the window and saying states are perfectly fine to have a free-for-all because, again, FFRA is designed to guard against both sides of the risk. So the only thing that we need to worry about is the labeling, but the states can do anything else with respect to the particular cancer that they would like. If I'm understanding the question correctly, states, with respect to labeling, cannot propose their own labeling. States, of course, remain free to restrict the use of the pesticides under 136 DA. So if a state said, look, within my borders, I just don't think this pesticide is safe, don't use it, they're free to do that. Why can't they impose tort liability then if they can stop the product from being sold at all? If that greater power exists, why doesn't the lesser power, without saying a label on it? I mean, we know we can't change the label. Well, again, you could say you can't sell the product. What you can't do is countermand the judgment Congress put in— About the label. You can label whatever label you want on it. Then is the premise of it just a design defect claim? I'm sorry not to follow the question, but what states can do is say— If we say it's so hazardous, we can ban it. Why can't we say it's so hazardous that there can be tort recoveries for it? I think that would just be a sort of defective design suit and it would go into what Mr. Clement said. Those are fine under Bates as long as it's not a label claim. Those would be fine. A design defect claim that is not masquerading as a failure to warn claim is permissible under Bates for the reasons Mr. Clement said and the reasons that Bates itself recognizes. How does that petition for cancellation process work that you described to the Chief Justice? Can you lay that out? Sure. People can bring petitions— People, including states. Sorry, people, I believe, including states. There have been many brought by environmental groups and the other interested groups. You petition to EPA to cancel. It's a way to test, you know, is EPA— Cancel the registration. Cancel the registration. It then gets litigated out. There's judicial review of this process specified both in the specific cancellation provisions and, more broadly, in 136 N-E-F-F-R-A. Does that encompass a petition to change the label? It could, in theory, be because you think that to cancel it, you could say it shouldn't have been registered at all because it's misbranded for whatever reason. Again, if EPA also thought that there was some sort of misbranding risk, as a practical matter, what happens is EPA gets information and might ask the manufacturer, like, can you please try to amend your registration and change it? And if they don't, at that point, you might have misbranding. Is there any judicial review of a denied petition? Of denied petition for cancellation? Yes. The whole process is set off in 136 N. It's a petition process similar to denials of registration. The whole—any final EPA action under 136 N is judicially reviewable. It's a very prescribed process. And on top of that, I just want to correct some sort of—any misimpression that EPA is just sort of sitting on its hands, like, every 15 years it springs into action. EPA itself does monitor new information. Whenever it comes to light, it often calls for information from manufacturers. Daxel is a great example of that. That is a pesticide where EPA became aware of possible thyroid risks in unborn babies. EPA asked the manufacturer for information. The manufacturer is dragging its feet. EPA threatened to suspend the registration. The manufacturer supplied the data. EPA was unsatisfied and said it was going to cancel the pesticide. It's now off the market. So I don't think this is a situation where there aren't sort of means by which people can bring information to EPA's attention. The whole point of the registration process and why it takes long is throughout, like, that process, EPA is often soliciting information from people to comment on interim steps in the decision. And so that's one reason it takes a while, honestly. Thank you, counsel. Justice Thomas? Justice Alito? Justice Sotomayor? If I understood Mr. Clement, he was saying that even if the law permitted the manufacturer to choose to add a cancel warning, it would still be express preemption because the state would require it as opposed to giving the manufacturer a choice. Is that your position as well? I would just put a little refinement on that. I think that's probably correct as a conceptual matter. But one reason backstopping it is a process I described where if EPA identifies a risk, it has a completely different process and sort of mitigation procedure for figuring out what kinds of warnings are adequate to guard against the risk. So EPA is very zealously saying not only yes or no, do you need a particular type of warning, but for that type of risk, what is the best way of making sure that not just the person using the product but people who might have secondary exposure to it or endangered species get the information they need to ideally mitigate the exposure risk? So what do we make from their 2022 statement where they were approving the California Proposition 65 label? It hasn't been withdrawn, correct? Respectfully, that's from 2012. I'm sorry, I misspoke. It's okay. It's with respect to a different product. So I think you make absolutely nothing of it. We have said repeatedly ever since then that was an error. More relevant are two things, one law, one fact. On the law, Mr. Clement is correct that the label regulations could not be clearer if you were doing something like a hazard warning, which I don't see any way of describing a cancer warning as anything other than that. You must get agency approval. That's what it says. That's 156.70. Two, on the facts, I would say the even more relevant facts for Prop 65 would have to do with glyphosate itself. Whenever pre-first Trump administration people were using those warnings on glyphosate products, they were always submitting amended registration requests. The agency approved those. So even that universe of Prop 65 warnings, which again are just saying California thinks this might cause cancer, not this causes cancer, even those went through the amended registration process requiring EPA approval. Now, the first Trump administration said that's misbranding. Don't do that at all. And there's a lot of water under the bridge at this point because those specific warnings were invalidated on First Amendment grounds by the Ninth Circuit. But I don't think Prop 65 can possibly get responded anywhere either on law or facts for those reasons. Thank you. Justice Kagan? Justice Gorsuch? Justice Kavanaugh? Justice Barrett? Justice Jackson? Can I just quickly ask you about doesn't the statute contemplate that the EPA will approve label changes if they're consistent with the first? So we're not talking about an arduous process here. If the manufacturer proposes a label change, I think the language of the statute says the registration shall be amended to reflect such a change. But respectfully, it is very arduous because as part of that process, and if you look at the regulations at 156, it's the regulations at 156 onwards, what they say is you have to also submit data adequate to support the change so that the agency can go through and make sure whatever label change you're proposing, especially if it's a cancer or other hazard warning, is not itself misbranding, is consistent with RIPRA. This is not just a, like, send me a quick letter, don't tell me why you want to change your label situation. Again, and that reflects these are regulations that are trying to implement the mandate not to have misbranded pesticides. No, I understand, but it's the suggestion that, you know, we can't do it on our own. It looks as though you pretty much can if you send the relevant information. The registration shall be amended. Respectfully, I don't think the idea that just because you might think approval is easy in certain situations is enough. I think that would be directly contrary to Pliva and Bartlett, where the court said... What about Wyeth? Is this like Wyeth? No, it's completely different from Wyeth. There's a very stark contrast. For the changes to be affected regulations for the FDA for brand manufacturers in Wyeth, it really was you brand manufacturer allowed unilaterally to change your label for this period of time. FDA will then tell you if it disagrees. Here, it's the opposite. It is do not change your label. Under no circumstances change your label if it's a hazard warning unless EPA says yes. And that is in the heartland of what Pliva and Bartlett said, which is if your action depends on the approval of a federal agency in order to do it, then you are not able to unilaterally act for purposes of federal law. And when state law is telling you you better change that warning, that is a direct conflict, or in the words of Bates relevant here, that would be different from state law. Thank you. Thank you, counsel. Mr. Keller? Mr. Chief Justice, and may it please the court, you unanimously held in Bates that a pesticide can be registered and nevertheless misbranded, even if it uses the label that EPA approved at registration. Yet Monsanto now asks you for the opposite holding, that Roundup cannot be misbranded as a matter of law because EPA found for the first time 50 years ago as a matter of fact that it is safe, based on information Monsanto submitted. After two briefs and a lot of podium time, Monsanto still hasn't pointed to one word in FIFRA's text that says the agency's factual findings at registration create a requirement for labeling. That's because the text repudiates that proposition in no uncertain terms. 136 AF2 is an anti-delegation clause. It says that the agency's findings at registration are nothing more than prima facie evidence of compliance with the labeling requirements. Prima facie evidence is not a law of the United States made in pursuance of the Constitution. It is a thumb on the evidentiary scales that can be rebutted, and a reasonable jury has rejected that evidence. With no satisfactory response to 136 AF2, Monsanto changes the subject, making the totally uncontested point that the express preemption clause talks about requirements under FIFRA. We agree. We're good textualists. We don't ignore prepositions, and we agree. There are affirmative delegations of authority to the administrator to issue regulations that create labeling requirements. Monsanto's problem is they're not relying on any of those regulations. They're relying on registration and registration alone. There is nothing in, by, under, or next to FIFRA that makes the registration decisions that EPA makes binding labeling requirements with preemptive force. I welcome your questions. Could you tease out your delegation argument and the impact that has on preemption? Yes, I can, Justice Thomas. I think a good example would be imagine if the EPA had promulgated a notice and comment rule. It went through an entirely formal process that in the Chevron regime would have unquestionably satisfied need, saying roundup is perfectly safe. There's nothing wrong with glyphosate. If you put any type of warning on glyphosate, we, the EPA, determine that that would be misbranded. In the old regime, I think you could say we're going to engage the fiction that Congress intended to delegate that power to EPA. We don't need some source of text saying that they can do that. I think in the new Loper Bright regime, you would say point to text delegating that power to the agency directly. Well, they don't have that notice and comment rule, but they're trying to rely just on 136A, the registration process, to say whenever the EPA approves the label at registration, even if it's from 1974, that is the label. The label is the law. It can't be anything other than that for purposes of misbranding. But nothing in 136A says that. Everything that the administrator does under 136A is textually linked to the administrator's power to register the pesticide. He shall register the pesticide or he shall not register the pesticide. He's not liquidating the meaning of whether roundup is misbranded for all purposes. He's expressing his opinion on the matter. You heard last week the FCC case, and it sounds like some of you might be willing to say when the FCC issues an order saying pay hundreds of millions of dollars, that's just the FCC's opinion on the matter. It doesn't become actually the law until a jury finds the facts and enters a verdict. I think there are other problems with 136AF1. You heard my friend on the other side and my friend from the United States saying that that requires preclearance for a label. I don't agree with that proposition. Look at the text. It says if the labeling is changed, past tense, then the administrator shall amend the registration. There's nothing that requires the manufacturer to wait for the amended registration. There's nothing that even requires the manufacturer if the EPA says no, I'm not amending the registration, to walk back the label change. The only thing that the EPA administrator could do in that sense is bring a civil penalties action, a criminal penalties action where there would be a jury trial, right, or bring cancellation proceedings where the manufacturer would get to defend itself in a formal adjudicatory process with cross-examination and calling live witnesses, the kinds of formality, again, even in the old regime that would have been required before you give agency action the force of law. You said in Mensing you're not going to play a mouse trap game to create impossibility. You're not going to benefit plaintiffs by saying, well, you could have gone to the FDA and sought prepermission or approval, and they might have said yes. You shouldn't play a mouse trap game for the other side either. They shouldn't be allowed to say, well, we didn't even try to amend our label, which we unilaterally could have done, but if we had, the EPA might have told us no, and they might have brought these cancellation proceedings, and they might have then won those proceedings, and it would have stuck in court. That's too many links in a causal chain for impossibility analysis to apply. I also think we could talk about the regulations that my friend on the other side – Before you do that, can you just speak to AF2 and the clause that talks about not being a defense? Yes. Mr. Clement indicates that that's not a defense to an EPA action. Is that your understanding as well? No. I very respectfully think Mr. Clement has a pretty tortured reading of the first sentence of 136 AF2. It says, in no event shall this be a defense to any violation of FFRA. Obviously, that includes any of the definitions of misbranding. You can see the offense in 136 JA1E, which defines any misbranded sale as a violation of the statute. He wants to reread 136 JA1E to say any misbranded pesticide is really just a pesticide that doesn't use the label that EPA approved at registration. That is not a possible reading of any misbranded pesticide, particularly given paragraphs B and C. So if you want to follow the statute, it's at page 40 of the red brief appendix. Congress knew how to lock in place information from the registration statement. Paragraph B says you can't sell even a registered pesticide with claims made for it, different than the registration statement. Paragraph C says you can't sell a registered pesticide with a composition different from the registration statement. If paragraph E were really meant to just be you can't sell a misbranded pesticide and the definition is the label departs from the one in the registration statement, of course Congress would have used a parallel formulation, but it didn't. So I think 136 AF2's first sentence can't possibly bear the meaning that he's suggesting. He also suggests, I believe, that 136 AF2's first sentence is not in itself the thing that he's using as the defense. He says it's not registration alone, it's registration plus the EPA's findings of safety at registration. That doesn't make any analytical sense. He's saying that the EPA has to consider safety at registration. So he's saying it's no defense by itself, it's just a defense if the EPA does the job that he says they are statutorily required to do, and then it's a complete defense. That's adding a lot of words to the statute that I don't think bear a plain meaning. Your friends on the other side rely heavily on Regal, and they did in their opening briefs. In the reply brief they say, well, you just mentioned it, you know, pages 49 and 50 of your brief kind of in passing. I wonder if you want to give a fuller exposition about why your case is different than Regal. Of course, Mr. Chief Justice. I thought our three paragraphs at the end of the brief were persuasive, but let me hum a few more bars on that score. So first, there's nothing like 136AF2 in the medical device amendment. So that's a huge distinction. 136AF2, again, I think is making very clear that registration doesn't have the effect that the medical device amendments do. Second, in Regal, you found as a matter of the statute, not as a matter of regulation, we didn't have to ask a loper break question, as a matter of the statute, that once the FDA approved the medical device, you couldn't depart from the label. So that's an obvious distinction. And then finally, even then, you preserved the option of a parallel claim. In the penultimate paragraph of the opinion, you said, we're not going to address whether a misbranding claim could proceed here because there is an obligation under the Federal Food, Drug, and Cosmetic Act to not sell a misbranded device. Stop selling is the duty. Ms. Regal might have been able to pursue that sort of claim, but she raised it too late. We're a court of review, not first view, as you said many times, so you're not going to address it. So you left open the question that's not open in FIFRA because you have Bates, and Regal didn't overrule Bates sub salientia. Just to be simple-minded about this, Mr. Keller, you have a preemption provision that's labeled uniformity. It's clearly designed to achieve uniformity in labeling, and what uniformity would your regime achieve? Uniformity in law. So I believe that the express preemption clause is requiring uniformity in law. The law of Missouri and the law of the United States have to be the same. They can't be in addition to or different from each other, so it is truly requiring parallel law. It does not require fact finders to find the facts the same way. So the law of the United States and the law of Missouri could be the same. One jury could say, Monsanto didn't do it. There's nothing wrong with this pesticide. Glyphosate is totally safe. There's no breach of duty. That's not a preemption question. That's a question of breach of duty, and a different jury could come out the way Mr. Durnell's jury did. Congress could, of course, write a different express preemption clause. Monsanto is lobbying literally right now for Congress to do that, and if they are successful through the bicameralism and presentment process, we would begrudgingly concede that these state claims would be preempted, but that's not the law Congress wrote. Do you think it's uniformity when each state can require different things? I don't think each state can require different things. The law has to be uniform. So if Missouri law was in addition to a different thing. The label's illegal in one state and legal in another state. That's uniformity? I don't agree with that. The label's not illegal in one state and legal in a different state. A jury has found the facts to say. The label subjects you to liability in one state and does not subject you to liability in the other state. Is that uniformity? I don't think it's state by state. I think it's jury by jury. You noted in Bates that despite the government's claim of a cacophony or a patchwork or a crazy quilt, that's just the consequence of our civil jury system where you have individual cases or contributions. I agree with you. Absent a clause that says uniformity in federal law. It says uniformity, but uniformity is the caption. What does the actual text of the uniformity clause say? It says you can't have any requirements for labeling in addition to or different from those required under FIFRA, and the requirements for labeling are those supplied by the misbranding prohibitions defined by Congress in 136 subsection Q. So as long as Missouri mirrors those requirements, Bates says a requirement is a rule of law to be obeyed. So if Missouri law and federal law have the same requirements, it's not in addition to or different from them. If they changed the label from what EPA had said, would they have been violating federal law? So, no, this goes more to impossibility. I agree with Justice Barrett. In this context, I don't see how impossibility and express preemption could come out differently. You have cases like Dyer where you say you can still go on to implied preemption, but here it requires parallelism. It can't be in addition to or different from, so they have to be the same. Justice Thomas, you've talked about this. Just to go to my question, if you could. Under federal law, if they do a different label than what EPA has approved, would they be violating federal law? No. I think I win that three different ways. I don't think the statute prohibits a label change. Look at 136J. There's a long laundry list of prohibited acts. Changing the label unilaterally is not on that list. We've already talked about 136AF1. I don't think that there's anything there. Is the Solicitor General wrong about that? Very respectfully, yes, he is. And you don't give deference to the Solicitor General in interpreting FIFRA. You look at the words for yourself. So, yes, the United States is wrong about that. Then they go to the regulations. They quickly jump to the regulations. What's the source of authority for those regulations? If you ask the EPA the source of authority for those regulations, I kid you not, it's 136 to 136Y. They cite the entire statute. That's their source of authority. If you cite the entire statute as your source of authority, that's a pretty good indication that you don't really have a good textual source of authority. Again, maybe in the Chevron regime we might have looked past that. But in the Loperbright regime, I think you need affirmative text. Mr. Keller, does Loperbright say one word about preemption? No, it doesn't. Loperbright is about the relationship between two branches of the federal government, right? Well, I agree with that. I think it is always a separation of powers issue if you're going to ask whether the executive branch gets to pronounce what the law is instead of the judiciary. And then, of course, that's relevant in the preemption context. Why is it relevant? A preemption involves a relationship between the federal government and the states. It does. And under the Supremacy Clause, federal law is the supreme law of the land. So what counts as federal law is relevant to every preemption inquiry. I would be surprised if Loperbright were somehow cabined and not applied in preemption cases where a regulation is doing the work to create preemption. You have the separation of powers problem plus a federalism problem because you're letting the executive, not Congress, preempt valid state law. That should only be done pursuant to a valid delegation. Well, your questions about where the law might go is interesting, but it's not there now, is it? Well, I think that that's what you meant in Loperbright. You all know better than I do what you really meant in Loperbright. But I think a rule that says the Loperbright regime is cabined to separation of powers cases and doesn't apply in preemption cases, I don't think makes analytical sense. You could draw that line. You've drawn lines before that maybe previously didn't occur to me that subsequently emerged. So I'm not going to tell you couldn't do it. You think that would be an irrational line to draw? I do, yes, because Loperbright is asking the same sort of question. Who decides what the law is? Is it the judiciary or is it the executive branch? That is obviously relevant to preemption questions when we're trying to figure out what the law of the United States says. Well, Loperbright didn't suggest that Congress couldn't delegate power to agencies. I agree. And it seems here as though there's a pretty big delegation of power to EPA to figure all these matters out. I agree. I agree there is an important set of delegated powers to EPA. And there are many that we haven't discussed that I do think would create labeling requirements. But the registration provision of 136A, which is where he and the government hang their hats, I do not think is this broad delegation to ultimately decide whether a pesticide is misbranded or not. I agree with you, though. There are express delegations of authority that I do think could create labeling requirements. I can give you 136WC2. Well, I mean, if you just sort of think about this scheme, right, it says to EPA you have to do this big study. You have to weigh costs and benefits. You have to figure out on the basis of that whether to register a pesticide. You have to do that again every 15 years. You have to keep track of things in the interim. You have to, you know, take seriously further information that industry gives you after registration. It just seems like a lot of stuff that the EPA does and is told by Congress to do to ensure the appropriateness of a particular pesticide. I completely agree with you. FIFRA is structured in a way to maximally protect the consumer. So selling an unregistered pesticide is the first offense in 136J. But you also can't sell a misbranded pesticide. And so regardless of what the EPA says, they are not a safe harbor. They don't get to announce for you by registration all of those other provisions to protect the consumer from these dangerous products, which by definition kill living organisms. They just don't have that blanket immunity. I agree that EPA has all of those obligations. And though I think there are a lot of conscientious people working at that agency, I think we should also all agree that things slipped through the cracks with that agency. They were a decade behind schedule in their re-registration of Roundup, only to have their findings regarding human health vacated by the Ninth Circuit in a decision they don't challenge. So the last re-registration that we have is 30 years old, 1993. It would also probably not surprise you if they're not constantly keeping abreast of all of the annual reports. You've said similar things in the Food, Drug, and Cosmetic Act context, where there's a lot more rigorous upfront data because human data, Phase III clinical trial data is given to the FDA. And even there, the FDA agrees that post-NDA application, post-approval, you can still have a misbranded drug. It shouldn't be less protective of consumers under the context of FIFRA, where the EPA is operating with less information. On those points, can you speak to the petition process that Ms. Harris was addressing, the petition to change the process where you go to EPA and say there's new science, you're behind the times, everything you just said. I thought there was a process you can go to EPA, but I want you to address what you think of that. I actually think Ms. Harris said it exactly right. There is a process by which citizens, and I'll confess, I don't know if states can as well, but I'll take her word for it that states can also go and say you shouldn't have re-registered this pesticide, and there can be a formal process. The agency, of course, would get deference, but there is judicial review under, I believe, 136a. Are there any labeling and packaging requirements under this subchapter in your view? Yes, many. So 136WC2 is a good example of an interaction between what the agency does and labeling requirements. I think you can find that at page 48 of the red brief appendix. So 136WC2 invites the EPA by notice and comment rulemaking to designate a pesticide highly toxic command. That designation creates labeling requirements because a highly toxic pesticide is misbranded if it doesn't have the skull and crossbones on the label or if it doesn't have poison in red letters. That's 136Q2D. So if Missouri law said put poison in purple letters, it would be preempted. If Missouri law said don't scare consumers with the skull and crossbones, it would be preempted, and it would be preempted under FFRA because it's the operation of the misbranding prohibition in conjunction with a valid delegation of authority. Congress knew how to delegate authority. The danger caution example in Bates is another one. 136A subsection D is where there's an express delegation to regulate, to create signal words on restricted use pesticides. So even though Bates didn't go into a long discussion of where that source of authority was, again, we were in the Chevron era so it didn't have to, there's an actual delegation. Congress knows how to delegate this authority. It didn't through the registration process. Thank you. I'm happy to see back time. Mrs. Thomas. Mrs. Lee. Mrs. Jackson. Thank you, counsel. Mr. Clement. Thank you, Mr. Chief Justice. Just a few quick points in rebuttal. My friends started with Bates. Bates really is distinguishable because it was mostly talking about efficacy and went out of its way to say safety is different. You can sort of think that in some respects Bates is like Lohr to Regal. Lohr said 510Ks, we really don't do a lot so we're not focused on that much. There's nothing there to essentially have preemptive effect. The pre-market approval in Regal was different. I think it's the same with respect to efficacy and safety. On Regal itself, my friend offers two distinctions. I don't think either of them works. First, he says there's no equivalent to F2. But even without the equivalent of F2, nobody in Regal thought that just because you got pre-market approval, that didn't mean you couldn't possibly mislabel your device if you used labeling that was different from what was approved in the pre-market approval process. So F2 really doesn't do anything that wasn't already implicit. And then he also pointed to, he said, well, there's a statutory provision there that said that you can't change the labeling. If you look at the provision Justice Scalia cited there, you'll see that it's very analogous to the F1 provision that basically says you can't change the label and you have to read the whole sentence because at the end it says without the approval of the agency. So Regal really is parallel here. The possible difference is there's still more open in this regime because you can have design defect claims. You can have states, if they really want to say you can't use it, but states have options that they didn't have under the medical device amendments. So let me just finish with uniformity and practicality. On uniformity, it's worse than 50 states. It's every jury is a new day. And I checked, uniformity is a title, but it went through bicameralism and presentment just like the rest of the statute. So I think you have to take that seriously. Finally, just on the practicalities of this, if you tell any one of those juries that this fancy-sounding international association on the research of cancer found a hazard warning for glyphosate, that sounds pretty bad. But every agency around the globe, New Zealand, Japan, Australia, the European Union, Canada, they've all looked at glyphosate. It's probably the most studied herbicide in the history of man. And they've all reached the conclusion based on more data and the kind of expert analysis they can do that there isn't a risk here. So you shouldn't let a single Missouri jury second-guess that judgment. Thank you, Your Honors. Thank you, Counsel. The case is submitted.